IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION



EOD
04/01/2011

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SUZANNE JACOBS** | § | |
| xxx-xx-8296 | § | Case No. 09-61145 |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| AUSTIN BANK, TEXAS N.A. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 10-6005 |
| | § | |
| SUZANNE JACOBS | § | |
| | § | |
| Defendant | § | |

### <u>MEMORANDUM OF DECISION</u>

This matter came before the Court for trial of the complaint of the Creditor-

Plaintiff, Austin Bank, Texas N.A. ("Plaintiff") through which it seeks to deny the entry

of a Chapter 7 discharge in favor of the Defendant-Debtor, Suzanne Jacobs (the

"Debtor"), pursuant to 11 U.S.C. §§727(a)(4)(A) and (a)(4)(C) or, alternatively, a

determination of whether an alleged debt owed to it by the Defendant-Debtor is excepted

from any such discharge pursuant to 11 U.S.C. §523(a)(4) because of alleged

embezzlement.  At the conclusion of the trial, the Court took the matter under advisement.

The following memorandum of decision disposes of all issues pending before the Court.[1]

---

[1] This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a).  The Court has authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding under 28 U.S.C. §157(b)(2)(A), (I), (J) and (O).

## Factual and Procedural Background

Suzanne Jacobs, the Debtor-Defendant in this case, was the primary shareholder, president and manager of a closely-held corporation, Sansing Jacobs, Inc. ("SJI"). The Debtor operated three separate businesses through the auspices of SJI. There were two "Curves" fitness facilities located in Emory and Quitman, Texas, respectively, that were operated as independently-owned franchises of Curves International, Inc. SJI also owned a facial spa facility known as "The Face Place."

The Debtor obtained financing for the SJI operations through the Plaintiff, Austin Bank, Texas N.A. (the "Bank"). The Bank is the holder of a promissory note[2] issued in the original amount of $40,025.00 that provided acquisition and operational financing to SJI in January 2008. That obligation was secured under a Commercial Security Agreement[3] by virtually all of the exercise equipment that was owned by the corporation and utilized in the operations of the two Curves franchises.[4] These lending documents were executed by the Debtor in her capacity as the executive officer of SJI as well as in her individual capacity. At the time of the original transaction in January 2008, the collateral was appraised at a value of $50,700.[5]

---

[2] Bank's Ex. 8.

[3] Bank's Ex. 9.

[4] The security agreement specifically granted to the Bank a security interest in "all equipment of the Debtor now owned or hereafter acquired," together with any accessories or replacements either "attached thereto or used in connection therewith." Bank's Ex. 9.

[5] The Curves equipment was purchased new from the franchisor and consisted of a number of new "Curves" exercise machines and systems as well as computers, recovery stations, and sterilization

Although some success was achieved in the early months of operation, these boutique businesses were particularly susceptible to economic downturns and the Debtor alerted the Bank at some point in 2008 that, despite her best efforts, her exercise clientele was diminishing and her various businesses were beginning to experience cash flow problems.  After the note was renewed some months later in February 2009, financial pressures increased.  The Debtor elected to close the Quitman store in July 2009 in a last-ditch effort to keep the Emory location financially afloat.  After she had notified her franchisor that the Quitman location had been closed, the Debtor was requested by Curves International, Inc. to sell some of the specialized Curves equipment from the Quitman store to a Curves franchisee in League City, TX.[6]  Without the knowledge or consent of the Bank, and perhaps in order to curry the favor of her company's franchisor, the Debtor sold the designated equipment, consisting of eight fitness machines and four recovery stations (the "League City equipment"), to the League City Curves franchisee for the sum of $2,500.00.[7]  The Debtor's assertion that all of these proceeds were used for corporate business purposes in an effort to keep the Emory business going stands uncontested.  A portion of the funds addressed outstanding interest owed to the Bank.  The remainder was used to pay for renovations to expand the Emory location to accommodate arrival of extra

---

equipment.  Clearly the use of new equipment by clientele for its designated purpose would subject that equipment in a short period of time to significant depreciation.

[6] The Debtor's assertion that this transfer was made at Curves International's request stands uncontested, but it is unknown whether the franchisor was aware of the Bank's security interest in the equipment or vice versa.

[7] Ex. 14.

equipment from the Quitman store.

After a few months, with the business income continuing to decline, the Debtor was forced to close the sole remaining "Curves" location in Emory on October 13, 2009 and the franchise agreement with Curves was terminated.[8]  The Debtor subsequently notified the Bank on October 16 of the store closure and of the availability of the equipment at the Emory location for repossession.[9]  Upon inventory of the Emory store equipment,[10] the Bank realized that several pieces of equipment listed in its original January 2008 inventory were missing.  To the Bank, this deficiency represented a "significant portion" of the collateral.

With the closing of her company's exercise facilities and with substantial liabilities to numerous parties remaining in existence, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code less than one month later on November 16, 2009.  She filed her original schedules and statements at the time of the filing.  Her husband did not join in the filing.[11]

Between the Debtor's bankruptcy filing on Monday, November 16, 2009, and Friday, November 20, 2009, the Debtor first learned that the Bank had taken initial steps

---

[8]  The Debtor's franchiser, Curves, International, acknowledged the termination of the Debtor's franchise agreement for the Emory location in a letter dated October 19, 2009 and asserted delinquent franchise fees of $28,320.00.

[9]  Ex. 11.

[10]  Ex. 12.

[11]  The Debtor's husband is a 65 year old former paint salesman who had earlier retired on 100% disability due to Lyme's disease.

to pursue a criminal complaint against her and her husband regarding the missing

collateral.[12]  In an attempt to forestall any criminal prosecution over what she believed to

be a misunderstanding, the Debtor met with the Bank's president, John Mebane, on

November 20.  She tendered the missing facial equipment to the Bank at that visit[13] and

offered to take additional monetary steps to resolve the Bank's outstanding concerns.  At

the direction of Mr. Mebane,[14] she wrote a letter to him outlining her proposal.[15]  The

letter asserts that the Bank, as of February 20, had received all of its collateral except for

"8 fitness machines and 4 recovery stations which were sold to a Curves in League City,

Texas at the request of Curves International in July 2009 after the close of my Quitman

facility."  The Debtor offered to provide to the Bank the $2,500 sum she had received for

the sale of the League City equipment, plus the proceeds from a proposed sale by her

---

[12] Joint Pretrial Order at 3, ¶ 9.  There are a number of factual uncertainties about the criminal complaint — which was not produced at trial.  Notwithstanding the assertions in the pre-trial order that the Bank "lodged a criminal complaint against the Debtor with Rains County authorities," it is unclear that the charges were filed with county authorities.  Indeed, it is not clear that an actual complaint was filed at all.  The testimony of the Bank's representative that "the Bank went to talk to the Emory police chief" was corroborated by the Debtor's testimony she was informed by the Emory police chief that criminal charges "were being threatened" by the Bank.  Further, the specific charges are not disclosed in the record, although the Debtor's subsequent letter to the Bank references "missing collateral or hindering a secured creditor."  Neither does the record disclose what specific collateral served as the basis of the complaint nor does it reveal why the Debtor's husband was included as a named defendant in the asserted complaint, though it is obvious that such an action increased the pressure upon the Debtor to reach a quick resolution of the matter.

[13] Ex. 13.  According to the Debtor, the facial equipment had not been left at the store location in order to protect it.

[14] It should be noted that Mr. Mebane did not testify at trial.  The only testimony regarding this meeting came from the Debtor who persuasively testified that she wrote the letter admitted as Ex. 14 at Mebane's specific instruction --- to reduce to writing the oral settlement offer she made at their November 20 meeting.

[15] Ex. 14.

**-5-**

husband of certain Rains County realty valued at $17,000 that the Debtor asserted was "the only thing of value Troy or Suzanne owns," in exchange for the withdrawal of all pending criminal charges and the promise by the Bank not to institute such charges in the future.[16]

Given that the bankruptcy case was proceeding and having not received any response from the Bank regarding her settlement offer, the Debtor, upon the advice of her bankruptcy counsel, retained a criminal defense attorney to advise her and her husband regarding the threatened criminal prosecution.  Although the precise date of that retention is not revealed in the record, it clearly occurred prior to the Debtor's examination at the §341(a) meeting of creditors conducted on December 11, 2009.  At that meeting, the Debtor, relying upon the advice of her criminal counsel, invoked her Fifth Amendment right against self-incrimination and refused to answer any questions regarding the Bank's collateral, including the disposition of the League City equipment in July 2009.[17]

The Debtor did, however, answer other questions at the §341 meeting.  When questioned by the Bank about her ownership of SJI, the Debtor acknowledged that she owned the company, but asserted that she owned no shares of stock.  When pressed by the Bank's counsel on this issue, the Debtor expressed confusion regarding any relationship between the corporation and the ownership of any stock certificates.  She acknowledged that she "owned and controlled the company" but she did not equate that control with

---

[16] Id.

[17] See Ex. 17, pp. 1-12.  In total, the Debtor invoked her Fifth Amendment rights with regard to twelve questions propounded by the Bank's counsel.

what seemed to her now to be meaningless stock certificates from a defunct company.

Further, her answers to other questions demonstrated a general lack of familiarity

regarding corporate governance and the distinction between corporate and personal

liabilities.

On or about February 5, 2010, the Bank filed the complaint which is the subject of

this adversary proceeding.  The complaint alleges grounds for the denial of the Debtor's

discharge under 11 U.S.C. §§727(a)(3), (a)(4)(A), (a)(4)(C) and (a)(5), as well as seeking

a determination that the debt owed to Austin Bank is non-dischargeable under 11 U.S.C.

§523(a)(4).[18]

After answering the Bank's complaint, the Debtor made a second settlement offer

to the Bank by letter dated March 30, 2010.[19]  In this effort, the Debtor, through her

bankruptcy attorney, informed the Bank's counsel that the collateral that was the "subject

of Austin Bank's complaint" had been retrieved and sought instructions for the proper

delivery of that collateral to the Bank.[20]  In fact, the Debtor had located substitute Curves

exercise equipment to exchange with the League City purchaser for the return of the

equipment she had originally sold.  The Debtor had driven to Stephenville, Texas to

---

[18]  At trial, the Bank abandoned its allegations under §727(a)(3) and (a)(5) as well as its assertion that the debt constituted a defalcation by a fiduciary under §523(a)(4).  However, the Bank maintained its allegation that the debt constituted an embezzlement under §523(a)(4).

[19]  The letter is actually dated March 30, 2009, but its chronological context and by its reference in the subsequent May 10 correspondence, this was clearly a typographical error.

[20]  Ex. 15.

acquire that equipment, transported that equipment to League City at her expense, and brought the originally sold equipment back to Emory for disposition by the Bank.  No response was received.  This offer was sent again six weeks later, sweetened by an additional offer to pay $1,500 in attorneys' fees to the Bank for its incurred expenses.[21] No evidence of any acceptance of this proposal was tendered in evidence, although it is clear that the Bank took possession of the returned League City equipment at some time after the May 10 correspondence ---- thereby restoring possession of all missing collateral to the Bank prior to trial.

## Discussion

The denial of a debtor's discharge is a harsh remedy and the provisions set forth in §727(a) are precisely drawn so as to encompass only those debtors who have not been honest and forthcoming about their affairs.  *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."].  Thus, in order to accomplish that limited purpose, the provisions of §727(a) are to be construed liberally in favor of granting debtors the fresh start contemplated by the Bankruptcy Code and construed strictly against parties seeking to deny the granting of a debtor's discharge.  *In re Ichinose,* 946 F.2d 1169, 1172 (5th Cir. 1991); *Melancon v. Jones (In re Jones)*, 292 B.R. 555, 559 (Bankr. E.D. Tex. 2003).

---

[21] Ex. 16.

As the Plaintiff seeking such relief, the Plaintiff bears the burden of proving that the

Debtor is not entitled to a discharge under §727.  The standard of proof for its claim is a

preponderance of the evidence.  *See, e.g., Everspring Enter., Inc. v. Wang (In re Wang)*,

247 B.R. 211, 213-14 (Bankr. E.D. Tex. 2000) ("The standard of proof for allegations . . .

under §727, is by a preponderance of the evidence.") (*citing Grogan v. Garner*, 498 U.S.

279 (1991) and *Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54 (Bankr. E.D. Tex.

1996)).

*Denial of Discharge Under §727(a)(4)(A): False Oaths.*

 Section 727(a)(4)(A) provides that:

(a) The court shall grant the debtor a discharge, unless —
(4) the debtor knowingly and fraudulently, in or in connection with the case—
 (A) made a false oath or account . . . .

As one court has recently stated, "the bankruptcy schedules and statement of

financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that

they ensure that adequate and truthful information is available to trustees and creditors,

not just an objecting creditor, without the need for further investigation to determine

whether or not the information is true and correct."  *Mullen v. Jones (In re Jones)*, 2011

WL 479063, at *34 (Bankr. N.D. Tex., Feb. 3, 2011).  Thus, an individual bankruptcy

debtor may forfeit entitlement to a discharge by knowingly and fraudulently making a

false oath.  "False oaths sufficient to justify denial of discharge include (1) a false

statement or omission in the debtor's schedules or statement of financial affairs, or (2) a false statement by the debtor at an examination during the course of the bankruptcy proceedings." *Buckeye Retirement Co., LLC v. Bullough (In re Bullough)*, 358 B.R. 261, 280 (Bankr. N.D. Tex. 2007). However, not every misstatement or omission in the schedules constitutes a false oath. Indeed, even multiple errors do not mandate the finding of a false oath without sufficient evidence of a fraudulent intent. *See, e.g., Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561 (5th Cir. 2005).

Thus, the creditor, as the objecting party, carries the burden of proof under §727(a)(4)(A) and must show by a preponderance of evidence that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent[22]; and (5) the statement materially related to the bankruptcy case. *Cadle Co. v. Duncan (In re Duncan),* 541 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992). However, if a plaintiff establishes a *prima facie* case that a debtor made false statements, then the burden shifts to the debtor to present evidence that she is innocent of the charged offense. *Id*.

The Bank asserts that the Debtor should be denied a discharge under §727(a)(4)(A) because she allegedly issued false oaths by: (1) failing to reference the sale of Curves equipment to the League City store in her original Statement of Financial Affairs; (2)

---

[22] Constructive fraud– circumstances indicating that the debtor *could* or *should* have known of fraud– is insufficient; only actual fraudulent intent warrants the denial of the debtor's discharge. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90-91 (5th Cir. 1989).

**-10-**

failing to list the SJI stock in her original Schedule B; (3) denying her capacity as the "owner" of SJI stock at the §341 meeting; (4) failing to reference the facial equipment as property held for another person (the corporation) in her original Statement of Financial Affairs; (5) omitting from her original Statement of Financial Affairs the fact that she had recently supplied a financial statement to the Bank; (6) failing to list a bookkeeper in her original Statement of Financial Affairs; (7) making other errors in the schedules including failing to list monthly mortgage payments as transfers and avoiding sufficient specificity in the listing of household goods, furniture, and yard tools.[23]

As an initial matter, the Bank failed to establish a *prima facie* case that the Debtor's failure to reference the transfer of the League City equipment in her individual schedules constituted a false statement.  It is axiomatic that a debtor need not schedule property owned by another person unless the debtor is holding such property for such person.  Specifically, the great weight of the evidence establishes that the Curves equipment transferred to the League City franchisee was actually owned by the corporation and the property was not owned by the Debtor in her individual capacity.[24]

_____

[23]  The Debtor cured all of these omissions through the filing of an amended set of schedules and statements.  However, subsequent amendments cannot expunge any fraud in the falsity of an oath on the original schedules.  *Sholdra v. Chilmark Fin. LLP., (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

[24]  The Debtor testified unequivocally and without contradiction that the equipment always belonged to the corporation.  The testimony of the Bank representative, Mr. McKenzie, did not contradict that characterization.  He testified that the Note was secured by all of the equipment associated with the operation of the Curves and Face Place stores in Emory and Quitman.  Indeed, both the corporation and the Debtor were directly liable to the Bank and both granted security agreements, but those documents contain no evidence of ownership.  One of the Bank's initial listings of equipment references ownership by SJI [Ex. 10]; but a subsequent document lists the equipment of SJI and the Debtor [Ex. 12].  Understandably, the distinction between the corporation ownership of assets and the Debtor's individual assets was of little interest to either party so long as the business operations were being conducted.

Thus, in the absence of sufficient evidence that the transferred Curves equipment belonged to the Debtor individually, its omission from her SOFA was proper and is not actionable under §727(a)(4)(A).

As for the issues surrounding the Debtor's ownership of the stock in her closely-held corporation, it is clear that she owned the stock and she admitted that the SJI stock was not listed in the original schedules.  Murkier, however, is whether any stock in this close corporation was even formally issued (other than existing as blank sheets in an unused incorporation book).  No direct proof of that was adduced.  There is little doubt that the parties attached limited significance to it.  The evidence clearly establishes that throughout this relationship and, as is often typical in a closely-held corporation context, both the Debtor and the Bank viewed the operation of these fitness facilities as "her" business, notwithstanding any legal formalities.  However, those formalities become critical when examining an accusation of lying under oath.

The evidence establishes that the Debtor's understanding of her personal relationship to "her" corporation was limited and unsophisticated.  Contrary to the Bank's contentions, she never denied owning the company.  She was simply ignorant of what role the corporate stock played in that ownership.  This discourse between the Bank's counsel and the Debtor at the §341 meeting, rather than demonstrating a materially false statement made with a fraudulent intent, illustrates the Debtor's confusion in this area:

Counsel:        Okay. First, Ms. Jacobs, in Schedule B-12, the question is any stock or interest you have in incorporated and unincorporated businesses. That's checked none.

**-12-**

| | |
|---|---|
| Debtor: | Okay. |
| Counsel: | Don't you own the stock of Sansing Jacobs, Inc.? |
| Debtor: | It's worthless. |
| Counsel: | No, ma'am. That wasn't my question what it's worth. The question is don't you own the stock of Sansing Jacobs, Inc., a Texas corporation? |
| Debtor: | I'm the president. |
| Counsel: | Do you own the stock– |
| Debtor: | I'm the president. I don't know if I own the stock or not. |
| Counsel: | Well, who else would own the stock. |
| Debtor: | I don't know. I guess the corporation. I honestly don't know. I'm not trying to be flip with you. |
| Counsel: | Are you the owner of that company? |
| Debtor: | Yes, sir. |
| Counsel: | Okay, then you own the stock ...[25] |

When evaluating whether a false statement is made knowingly, one court has explained:

> A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth. . . . Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel. Furthermore, a debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.

*Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 313-14 (Bankr. E.D. Pa.

---

[25] Ex. 17 at 4:14-25 through 5:1-3. This confusion was evident from the Debtor's testimony at trial as well.

2006).  This Debtor simply did not comprehend the significance of any SJI stock that was issued and outstanding, if any.  The Debtor freely acknowledged owning the company and being "the boss."[26]  There was no intentional deception.  To the degree that the SJI stock was ever issued, the Debtor's failure to list it in her original Schedule B was not knowingly false.

With regard to each of the purportedly false oaths alleged by the Bank, the evidence is simply insufficient to establish that any such statements and/or omissions were performed by the Debtor with a fraudulent intent or were material to the bankruptcy case.

A plaintiff in a §727(a)(4)(A) action must demonstrate by a preponderance of the evidence an actual intent to hinder, delay, or defraud creditors — a constructive intent is insufficient.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 384 (Bankr. E.D. Tex. 2009) *(citing Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)).  However, in most circumstances only the debtor can testify directly concerning his intent and "rare will be the debtor who willingly provides direct evidence of a fraudulent intent." *Neary v. Darby (In re Darby)*, 376 B.R. 534, 541 (Bankr. E.D. Tex. 2007).  Instead, the existence of a fraudulent intent is most often betrayed by an examination of a course of conduct. *First Tex. Savings Assoc. v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1989).  Thus, "[f]raudulent intent may be proved by showing either actual intent to

---

[26] *Id*. at 5:12-15.

deceive or a reckless indifference for the truth." *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see also*, *Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382-83 (5th Cir. 2001).  While virtually conceding that the record fails to contain sufficient evidence of an actual intent to deceive by the Debtor, the Bank contends that the numerous gaffes in the schedules reveal a degree of carelessness by the Debtor that constitutes a reckless indifference to the truth and, therefore, the existence of the requisite intent to deceive by the Debtor.

The Court finds no such pattern.  There is little doubt that a cleaner, more complete presentation could have been made in the Debtor's original schedules and statements.  The Debtor gave her attorney a list of assets and liabilities and apparently gave only a cursory review of the manner in which that information was displayed on the actual bankruptcy documents.  She incorrectly thought that the attorney would ensure that the given information was properly placed into the required format and would inquire about any apparent deficiencies.  That did not occur.  The Debtor's attorney should have been more circumspect in the creation of the schedules from the information supplied by the Debtor and the Debtor should have been more diligent in her review of them.  However, rather than the handiwork of a disguised fraudulent intent, a fairer examination of these circumstances reveals the errors and omissions to be primarily the product of misunderstanding and benign neglect — not a cavalier disregard for the truth.[27]

---

[27]  The Court has similar concerns regarding the materiality of the referenced errors.  However, because other requisite elements have not been shown, the Court need not engage in a detailed analysis of that issue.

-15-

In a similar vein, the Bank's complaint under §727(a)(4)(A) must also fail because it has failed to present sufficient evidence that any of these statements and/or omissions were material to the administration of the bankruptcy case.  A false statement or omission is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 692 (Bankr. E.D. Tex. 2009) (*citing Duncan*, 562 F.3d at 695).[28]   In this context, one must be reminded that the whole purpose of this subsection is to ensure "that adequate information is available for the trustee and creditors without need for investigation to determine whether the information provided is true." *Beauboeuf*, 966 F.2d at 179.  That important function was never jeopardized in this case as a result of these problems with the Debtor's schedules.  At all relevant times, the Bank knew that the Debtor was utilizing a corporate entity for the fitness facility operations and, to the extent stock actually existed, the Bank also knew that the Debtor owned the vast majority of that corporate stock.  The Debtor never concealed that she owned a now-defunct company. The Bank knew that it had previously required the Debtor to present personal financial statements.  The evidence clearly demonstrates that the Debtor had surrendered the facial equipment to the Bank and had disclosed the League City transfer to the Bank during the very same week in which the bankruptcy filing occurred – approximately three weeks

---

[28]  However, a finding of materiality is not dependent upon the value of the omitted assets or whether the omission was detrimental to creditors. *Pratt,* 411 F.3d at 566.

prior to the convening of the §341 meeting.[29]  There was no concealing of assets from the trustee and there was no deprivation of property from the bankruptcy estate.  Indeed, it is uncontested that virtually all estate assets were fully encumbered by the Bank's lien and that, even had the information been fully provided, it would have meant little, if anything, to the bankruptcy estate.  That conclusion is not an endorsement of the errors contained in the schedules and statements and the Debtor cannot be fairly acquitted of all responsibility for them.  However, notwithstanding the fact that the honest disclosure of information remains essential for the proper working of the bankruptcy system and must be zealously enforced,  the invocation of the drastic penalty inflicted by §727(a)(4)(A) is not warranted under the totality of these circumstances.  Accordingly, because the Bank has failed to sustain its burden of proof to show by a preponderance of the evidence that these errors were intentionally false, made with a fraudulent intent, and were material to the administration of the estate, the relief sought by the Plaintiff under §727(a)(4)(A) must be denied.

*Denial of Discharge Under §727(a)(4)(C): Bribery*

The Bank alleges that the Debtor's discharge must also be denied on the basis of bribery.  It contends that the Debtor's offer to resolve the dispute with the Bank that was memorialized on or about November 20, 2009 through a letter to John Mebane, president

---

[29]  Such disclosure occurred, in fact, on the same day that the initial appointee as Chapter 7 trustee rejected the appointment.

of the Bank,[30] as well as the settlement letter sent by the Debtor's attorney to the Bank's

adversary attorney on May 10, 2010,[31] each constituted an attempted bribe in relation to

the conduct of her bankruptcy case.  If accurate, such actions would justify the denial of

the Debtor's discharge under §727(a)(4)(C), which provides:

> (a) The court shall grant the debtor a discharge, unless —
>
> > (4) the debtor knowingly and fraudulently, in or in connection
> > with the case—
> >
> > > (C) gave, offered, received, or attempted to
> > > obtain money, property, or advantage, or a
> > > promise of money, property, or advantage, for
> > > acting or forbearing to act in the case in which
> > > the offender is a debtor...

11 U.S.C. §747(a)(4)(C).

The purpose of this section is to punish the efforts of a debtor "to subvert the

bankruptcy process itself, as differentiated from the seeking of an advantage with respect

to a particular claim." *Anderson v. Wendt (In re Wendt)*, 381 B.R. 217, 225 (Bankr. S.D.

Tex. 2007).  Accordingly, like the corresponding grounds set forth in other subsections of

§727(a)(4), the Bank must not only establish the predicate act; but also show that such act

was performed knowingly and fraudulently in order to prompt action or forbearance in

the bankruptcy case. The evidence establishes that both of the purportedly wrongful acts

taken by, or on behalf of the Debtor, occurred after the filing of the bankruptcy case.

The first episode upon which the Bank relies cannot establish liability under

---

[30] Ex. 14.

[31] Ex. 16.

§727(a)(4)(C) because the Debtor did not seek any action or forbearance in the bankruptcy case.  The letter written by the Debtor on or about November 20 specifically references that it was written "regarding pending criminal charges against myself or my husband, Troy Jacobs. . . ."  In regard to the monetary offer made to the Bank, the letter unambiguously states that:

> [I]n return for the above payment, Austin Bank will agree to withdraw all pending criminal charges against Suzanne Jacobs and or Troy Jacobs and Austin Bank agrees that no future criminal charges will be filed in referenced to the debtor Suzanne and Troy have; specifically for any missing collateral or hindering a secured creditor.[32]

The offer makes no attempt to affect any intended actions of Austin Bank with relation to the bankruptcy case — which had already been filed on that date.  Indeed it does not even mention the bankruptcy case.  Because the clearly-stated intent of the letter had nothing to with any "action or forbearance in the case in which the offender is a debtor," no §727(a)(4)(C) penalty is implicated or warranted.[33]

The second purported bribe relates to a settlement letter sent by the Debtor's attorney to the Bank's attorney after the commencement of the current adversary proceeding.  It read, in relevant part,

> Ms. Jacobs hereby extends a settlement offer of the above-referenced adversary proceeding of:  the return of the re-acquired equipment that was

---

[32] Ex. 14.

[33] Even had the letter referenced the bankruptcy case, there is no evidence

**-19-**

originally missing from the bank's collateral;[34] and the sum of $1,500.00 representing reasonable attorneys' fees expended by your client.[35]

This Court cannot find any violation of 11 U.S.C. § 727(a)(4)(C) from the evidence presented.  This letter shows only an attempt by a debtor's lawyer to negotiate a settlement of pending litigation with an adversary.  It is not extortionate.  It is not a bribery attempt.  It does not constitute conduct inconsistent with that expected of an honest debtor.  It does not evidence any knowing and fraudulent intent on the part of the debtor to commit any of the acts proscribed by 11 U.S.C. § 727(a)(4)(C).  It does not in any sense warrant the denial of the Debtor's discharge in this case.

Accordingly, the Debtor-Defendant, Suzanne Jacobs, is entitled to the entry of a discharge order pursuant to 11 U.S.C. §727(a).

*Nondischargeability Under §523(a)(4): Debt Arising from Embezzlement.*

As an alternative to its §727 allegations, the Bank asserts that Ms. Jacobs' debt should be declared non-dischargeable as a debt arising from embezzlement under 11 U.S.C. §523(a)(4).[36]  "Embezzlement is defined for the purposes of §523(a)(4) as the

---

[34]  The evidence conclusively demonstrates that, at the time of this letter, the Debtor had been seeking instructions from the Bank for weeks, without response, regarding how to return the reacquired collateral from the League City franchisee.

[35]  Ex. 16

[36]  11 U.S.C. §523(a)(4) states that:

(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt —
   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999).  Though the evidence presented would otherwise preclude the Bank from demonstrating the requisite elements of this subsection, including the fact that the equipment sold in League City was SJI corporate property and not the individual property of the Debtor,[37] the predicate action would still not constitute an embezzlement, even if the property *had* been owned by the Debtor individually.  The important fact is that the Bank did not own the property.  It is widely recognized that one cannot embezzle one's own property and, as one court explained,

> a debtor that misappropriates a creditor's collateral, and uses it for purposes other than repaying the creditor's loan, does not steal or embezzle that property.  The actions may be a breach of contract, or even conversion, but not embezzlement or larceny under §523(a)(4).

*Oak St. Funding, LLC v. Brown (In re Brown)*, 399 B.R. 44, 47-48 (Bankr. N.D. Ind. 2008); *see also, Assoc. Bank v. Sever (In re Sever)*, 438 B.R. 612, 631 (Bankr. C.D. Ill. 2010);  *JPMorgan Chase Bank, N.A. v. Algire (In re Algire)*, 430 B.R. 817 (Bankr. S.D. Ohio 2010); *Bank of Castille v. Kjoller (In re Kjoller)*, 395 B.R. 845 (Bankr. W.D.N.Y.

---

[37] The Complaint improperly asks that the entirety of the debt owed to the Bank be declared non-dischargeable – rather than just the specific $2,500 arising from the sale of the League City equipment and the subsequent use of those proceeds.  Further, the Bank alleges that the use of the proceeds was improper.  However, the uncontradicted evidence indicates that no embezzlement took place at all.  The Debtor used corporate proceeds for corporate purposes, including making a payment on the Bank's debt.

2008); *Franklin Bank, SSB v. Barnes (In re Barnes)*, 369 B.R. 298, 305-06 (Bankr. W.D. Tex. 2007).  Accordingly, the cause of action asserted under §523(a)(4) must be denied.

## Conclusion

The Court therefore concludes that all relief sought in the Complaint, not previously abandoned by the Plaintiff,[38] must be denied.   This memorandum of decision constitutes the Court's findings of fact and conclusions of law[39] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.  A separate judgment will be entered that is consistent with this opinion.

Signed on 04/01/2011

_____
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[38] See *supra* note 18.

[39] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

-22-